UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x

HERBERT MOTON,

        Plaintiff,

        -against-                                   No. 15 Civ. 8879 (CM)

MAPLEBEAR INC., d/b/a INSTACART,

        Defendant.
---------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/9/16

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT'S MOTION TO COMPEL ARBITRATION AND STAYING PLAINTIFF'S LAWSUIT**

McMahon, J.:

Plaintiff Herbert Moton ("Plaintiff" or "Moton") worked as a "Personal Shopper" for Instacart, a San Francisco-based technology company that enables individuals to provide same-day, on-demand grocery delivery services to customers in multiple cities across the country. Instacart provides the technical infrastructure for these services via its communications and logistics platform. That platform facilitates connections between "Instacart Customers," individuals who order food, drinks, and other grocery items from select retail stores, and "Personal Shoppers," individuals who retrieve and/or deliver those items to Instacart customers. *See* Declaration of Ann Wessing dated December 4, 2015 (Dkt No. 10) (hereafter "Wessing Decl.") ¶¶ 2-4.

When agreeing to become a Personal Shopper, Moton entered into and signed an Independent Contractor Agreement with Instacart. By executing that contract, Moton expressly agreed to submit "any controversy, dispute or claim arising out of or relating to the Services" performed as a Personal Shopper to binding arbitration with Instacart.

1

Moton alleges that he was actually an employee, that Instacart misclassified him as an independent contractor, and that Instacart failed to pay him overtime wages or reimburse him for certain work-related expenses. *See* Compl. ¶¶ 29-30. He requests that the Court declare that he is an Instacart employee pursuant to federal and New York law and award him unpaid overtime wages and expense reimbursements. *Id.* ¶¶ 61-65.

Instacart has moved to compel arbitration of the dispute, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and to dismiss the complaint or, in the alternative, stay all proceedings pending arbitration of the dispute.

## BACKGROUND

On January 6, 2015, Moton entered into an Independent Contractor Agreement (hereinafter "IC Agreement" or "Agreement") with Instacart in order to become a Personal Shopper. Wessing Decl. ¶ 12, Ex. A. To do so, he applied via the Instacart website. *Id.* ¶¶ 9, 12. Since March 2014 (when Instacart first launched services in New York City), the Instacart website has included a link on its front page that says "Become a Shopper." *Id.* ¶ 8. Clicking on that link takes the person to a dedicated Personal Shopper application portion of the website, which describes the tasks that a Personal Shopper may perform (*e.g.*, shop for groceries, deliver groceries, or both), the qualifications to become a Personal Shopper, an overview of the application process, and an "Apply Now!" link to start the application process. *Id.*

As part of the application process, Moton was required to review and sign an Independent Contractor Agreement with Instacart. *Id.* ¶¶ 9-13, Ex. A.

To manage its Independent Contractor Agreements with Personal Shoppers, Instacart uses (and has used since its inception) an electronic signature service called HelloSign. *Id.* ¶ 10. HelloSign maintains a time-stamped audit trail that tracks – using IP addresses and other identifying data – when each Personal Shopper applicant receives, views, and executes each

2

Independent Contractor Agreement. *Id.* It also enables an applicant, after being properly authenticated through various security measures, to sign the Agreement electronically. *Id.* HelloSign's Legality Statement represents that it complies with the U.S. Electronic Signature in Global and National Commerce Act of 2000 (E-SIGN)[1] regarding electronic signatures and transmissions, which would render HelloSign signatures valid and legally binding. *Id.* ¶ 11.

According to HelloSign's audit data, Moton reviewed the Agreement on January 6, 2015 for approximately six minutes before signing it. *See id.* (HelloSign audit trail information). Moton received a copy of his application materials, including the signed Agreement, at the completion of the application process. *Id.* ¶ 13. A copy of Moton's executed IC Agreement, as well as the corresponding HelloSign audit information, is attached to the Wessing Declaration. *Id.* ¶ 12, Ex. A.

Section 7 of the IC Agreement signed by Moton is entitled "DISPUTE RESOLUTION." *Id.* ¶ 12, Ex. A at § 7. Section 7.1 of the Agreement states:

> Following the full opportunity to discuss and negotiate over this dispute resolution procedure, *the Parties agree that to the fullest extent permitted by law, any controversy, dispute or claim arising out of or relating to the Services performed by the Contractor, this Agreement, the breach, termination, interpretation, enforcement, validity, scope and applicability of any such agreement,* or any allegations of discrimination or harassment on any basis under federal, state, or local law, which could otherwise be heard before any court of competent jurisdiction (a "Dispute"), *shall be submitted to and determined exclusively by binding arbitration.* The Parties agree that a Dispute arising under any law that requires resort to an administrative agency may be brought before such agency as permitted by law, and that after exhaustion of administrative remedies, the Parties must pursue such Dispute through this binding arbitration procedure to the fullest extent permitted by law.

---

[1] An electronic signature is valid and enforceable if it complies with the U.S. Electronic Signature in Global and National Commerce Act of 2000 (E-SIGN). *See* 15 U.S.C. § 7001 (a)(1) ("Notwithstanding any statute, regulation, or other rule of law ... with respect to any transaction in or affecting interstate or foreign commerce, (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity or enforceability solely because it is in electronic form").

*Id.* Ex. A at § 7.1 (emphasis added).

Paragraph 7.2 of the Agreement also contains the following clause regarding the administration of any arbitration:

> The arbitration shall be administered by JAMS at its office located at Two Embarcadero Center, Suite 1500, San Francisco, CA 94111, pursuant to its Employment Arbitration Rules and Procedures and subject to JAMS Policy on Employment Arbitration Minimum Standards of Procedural Fairness (collectively, 'Rules') that are in effect when arbitration is demanded...

Wessing Decl. Ex. A, ¶ 7.2. The JAMS Rules are attached as Exhibit B to the Agreement, and the website address to JAMS is also provided. *Id.* (Ex. B to the Agreement); ¶ 7.2 also states that "in the event of any conflict between the Rules and this Agreement, this Agreement shall apply." *Id.*

Paragraph 7.3 of the Agreement governs costs and fees of any arbitration as well as the remedies the arbitrator may award:

> The parties will equally advance all of the arbitrator's expenses and fees. The arbitrator will allow for sufficient discovery procedures, including access to essential documents and witnesses, to satisfy principles of due process. The arbitrator may award any remedy or relief available under applicable law in a court proceeding, including, without limitation, damages, costs and injunctive relief. The arbitrator shall not have the power or authority to commit errors of law or legal reasoning. After completion of the arbitration, the arbitrator shall submit a decision in writing, specifying the findings of fact and the conclusions of law on which the decision is based; in his discretion, the arbitrator may award fees and costs to the prevailing party.

Wessing Decl. Ex. A, ¶ 7.3.

Finally, Section 7.4 of the Agreement states:

The Parties agree that the enforceability of this Agreement shall be governed by the Federal Arbitration Act (9 U.S.C. § 2), and acknowledge that Company's business and the nature of Contractor's services involve interstate commerce. The arbitrator shall apply California substantive law to the proceeding, except for any claim to which Federal substantive law would apply. **The Parties each expressly**

4

**waive the right to a jury trial and agree that the arbitrator's award shall be final and binding on the Parties.** Any action to review the arbitration award for legal error or to have it confirmed, corrected or vacated shall be decided pursuant to California law and shall be filed and maintained in a California state court of competent jurisdiction.

*Id.* Ex. A at § 7.4 (emphasis in original).

After Moton electronically signed the Agreement (and completed other paperwork and training as part of the application process), he and Instacart proceeded to perform under the Agreement. Moton started using the Instacart Platform as a Personal Shopper on or around January 8, 2015. *Id.* ¶ 14. For its part, Instacart granted Moton access to its communications platform and paid out funds to him per the terms of the Agreement. *Id.*

On November 10, 2015, Plaintiff filed this lawsuit, alleging violations of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL"). On December 4, 2015, Instacart moved to compel arbitration and dismiss the complaint or, in the alternative, to stay this case pending resolution of Plaintiff's claims in arbitration.

Defendant's motion to compel arbitration is granted. Plaintiff's lawsuit is stayed pending the outcome of arbitration.

## DISCUSSION

### I.     Standard

The Federal Arbitration Act was enacted "to replace judicial indisposition to arbitration," *Hall St. Ass'n, LLC v. Mattel, Inc.*, 552 U.S. 576, 581 (2008), and it "is an expression of 'a strong federal policy favoring arbitration as an alternative means of dispute resolution.'" *Ross v. Am. Express Co.*, 547 F.3d 137, 142 (2d Cir. 2008) (quoting *Hartford Accident & Indem. Co. v. Swiss Reinsurance Am. Corp.*, 246 F.3d 219, 226 (2d Cir. 2001)). An agreement to arbitrate is "valid, irrevocable, and enforceable" under the Federal Arbitration Act. 9 U.S.C. § 2.

Arbitration agreements are contracts, "on equal footing with other contracts," so courts must "enforce them according to their terms." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citation omitted). Indeed, the purpose of the FAA was "to make arbitration agreements as enforceable as other contracts, *but not more so.*" *Opals on Ice Lingerie v. Body Lines Inc.*, 320 F.3d 362, 369 (2d Cir. 2003) (emphasis in original) (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967). "That said, a party may be compelled to arbitrate a dispute only to the extent he or she has agreed to do so." *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 569 (S.D.N.Y. 2009) (citation omitted). "'Generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements' in accordance with § 2 of the FAA." *Id.* at 566 (quoting *Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)).

There are four factors that a court must consider when deciding a motion to compel arbitration:

> [F]irst, it must determine whether the parties agreed to arbitrate; second, it must determine the scope of that agreement; third, if federal statutory claims are asserted, it must consider whether Congress intended those claims to be nonarbitrable; and fourth, if the court concludes that some, but not all, of the claims in the case are arbitrable, it must then decide whether to stay the balance of the proceedings pending arbitration.

*Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 75-76 (2d Cir. 1998).

"In the context of motions to compel arbitration brought under the Federal Arbitration Act . . . , the court applies a standard similar to that applicable for a motion for summary judgment. If there is an issue of fact as to the making of the agreement for arbitration, then a trial is necessary." *Bensadoun v. Jobe–Riat*, 316 F.3d 171, 175 (2d Cir. 2003). However, "If the party seeking arbitration has substantiated the entitlement by a showing of evidentiary facts, the party

opposing may not rest on a denial but must submit evidentiary facts showing that there is a dispute of fact to be tried." *Oppenheimer & Co., Inc. v. Neidhardt*, 56 F.3d 352, 358 (2d Cir. 1995).

There is no dispute in this case that the plaintiff's claims under the FLSA and the NYLL fall within the scope of the IC Agreement. Rather, Plaintiff opposes Instacart's motion to compel on the third *Oldroyd* factor, arguing that FLSA claims are non-arbitrable. *See* Pl. Opp. at 3-9.

Plaintiff also briefly argues that "more information and discovery is needed to determine whether an arbitration agreement exists, and if so, whether it is valid." *Id.* at 9-10. Though in doing so, Plaintiff does not explicitly oppose Instacart's motion to compel on the first factor, the request for discovery can be read to suggest that the information before the Court is insufficient to establish whether the parties agreed to arbitrate. I will therefore interpret Plaintiff's request for discovery as both a request for discovery and a challenge to the first factor.

## II. The Parties Agreed to Arbitrate and Plaintiff's Request for Additional Discovery is Denied

The party seeking to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts to the party opposing arbitration to put the making of that agreement 'in issue.'" *Hines v. Overstock.com, Inc.*, 380 F. App'x 22, 24 (2d Cir. 2010). To satisfy the initial burden, the moving party need not establish that "the agreement would be *enforceable*, merely that one existed." *Id.* (emphasis in original). Once the party has made a prima facie showing that an agreement existed, the party "seeking to avoid arbitration generally bears the burden of showing the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp. –*

*Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000)). *See also Schreiber v. K-Sea Transp. Corp.*, 849 N.Y.S.2d 194, 196 (2007).

Courts have permitted limited discovery into the validity of the arbitration agreement only when the party opposing arbitration "come[s] forth with reliable evidence that is more than a 'naked assertion… that it did not intend to be bound' by the arbitration agreement, even though on the face of the pleadings it appears that it did." *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 774 (3d Cir. 2013).

In *Deputy v. Lehman Bros.*, 345 F.3d 494, 510 (7th Cir. 2003), the court specifically addressed the validity of a signature on an arbitration agreement. In that case, plaintiff's sample signatures resembled the signature on an arbitration agreement, but plaintiff had submitted an affidavit that she did not sign the arbitration agreement. The court held that there was an issue of fact as to the validity of the signature that should be resolved by a hearing.

Instacart has submitted admissible evidence establishing a prima facie case that it entered into a valid arbitration agreement with Moton. The evidence demonstrates that Moton signed the IC Agreement after being provided with sufficient time to review it; that he was given an electronic copy of the Agreement, including a copy of the JAMS Minimum Standards of Procedural Fairness; and that, thereafter, the parties performed under the Agreement. Wessing Decl. ¶¶ 12-14, Ex. A. That evidence includes an audit trail showing the date and times when the documents were sent to Moton, when he reviewed them, and when he signed them. *Id.*, Ex. A at 23. According to Instacart's counsel, the unredacted version of the audit trail in Exhibit A (which was provided to Moton) shows Moton's personal identifying information, including his IP address – further evidence that Moton did, in fact, view and sign the IC Agreement. *See* Def. Reply at n.6; Wessing Decl. at ¶ 12; Ex. A.

Moton has failed to offer any facts or evidence – let alone "reliable evidence" – that the agreement is invalid or that he did not intend to be bound by it. Instead, his request for discovery is based on mere speculation – first, that the electronic signature on the agreement "looks different" from his real signature, and second, that the agreement is somehow invalid because the "non-traditional computerized contracting process was administered by a third-party." Moton also says that "there is no reliable evidence that he actually received" a copy of the JAMS' rules and conditions. Pl. Opp. at 9-10. But Moton does not deny that he received and signed the IC Agreement, and no discovery can add to the store of his knowledge; Defendant has hard evidence that he received the agreement and Plaintiff, who is in a position to say otherwise, does not do so. Plaintiff has not submitted any affidavit insisting that he did not sign the agreement, as was the case in *Deputy*. All information pertinent to the "suggestions" made by Plaintiff would be within Moton's possession, custody, and control and no one else's.

Accordingly, because Moton has failed to offer any facts or evidence to place the validity of the Agreement to arbitrate in issue, he has not satisfied his burden to show that the Agreement is invalid, and he is not entitled to discovery.

### III. Plaintiff's Claims Are Arbitrable

There is no evidence that Congress intended FLSA claims to be non-arbitrable. *See Arrigo v. Blue Fish Commodities, Inc.*, 704 F. Supp. 2d 299, 304 (S.D.N.Y. 2010). Courts in this District have repeatedly found both FLSA and NYLL claims to be arbitrable. *Reynolds v. de Silva*, 2010 WL 743510 at *5 (S.D.N.Y. Feb. 24, 2010) (collecting cases).

#### A. *Barrentine* Does Not Render Plaintiff's Claims Non-Arbitrable

Plaintiff relies on *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 101 S. Ct. 1437, 67 L. Ed. 2d 641 (1981) for the proposition that Congress intended FLSA claims to be non-arbitrable. In doing so, Plaintiff misreads *Barrentine*.

9

In *Barrentine*, petitioners brought an FLSA claim in federal court after having unsuccessfully submitted a wage claim based on the same underlying facts to a joint grievance committee pursuant to the provisions of their union's collective bargaining agreement. The Supreme Court held that petitioners' wage claims under the FLSA were not barred by prior submission of their grievances to the dispute resolution process because an employee's rights under the FLSA *as an individual* might not be adequately protected by his union's collective bargaining process. *Id.*

In particular, the Court noted that a union's interest in maximizing overall compensation for its members may mean that "a union balancing individual and collective interests might validly permit some employees' statutorily granted wage and hour benefits to be sacrificed" to benefit the workers in a bargaining unit as a whole. *Id.* at 742. Further, the Court reasoned that the grievance committee is "required to effectuate the intent of the parties" in the collective bargaining agreement, even if that intent is inimical to an individual's protected statutory rights under the FLSA. *Id.* at 744-45. In other words, the committee had no authority – and no obligation – to award damages provided by the FLSA but was "confined to interpretation and application of the collective bargaining agreement." *Id.* at 745.

By no means does *Barrentine* stand for the proposition that FLSA claims are non-arbitrable. Rather, *Barrentine*'s narrow holding permits an FLSA claim to be heard in federal court even where that claim arises out of the same facts that could give rise to a claim under an employee's collective bargaining agreement. *See id.*

Nor do the policy concerns underlying *Barrentine*'s holding apply here. Unlike *Barrentine*, this case involves an independent contractor agreement between Moton, an individual, and Maplebear, Inc., doing business as Instacart. The agreement clearly and

unequivocally requires arbitration of all claims arising out of or relating to Moton's services as a Personal Shopper for Instacart. Wessing Decl. Ex. A (IC Agreement at ¶ 7.1). The arbitration would not be conducted pursuant to any collective bargaining agreement, but rather pursuant to the FAA. *Id.* at ¶ 7.4. And the relief available to Moton in the arbitration is not limited by any aspect of the IC Agreement, which provides that the arbitrator "may award any remedy or relief available under applicable law in a court proceeding, including, without limitation, damages, costs, and injunctive relief." Wessing Decl., Ex. A (IC Agreement at ¶ 7.3). Accordingly, *Barrentine* simply has no application to this case.

The Second Circuit cases applying *Barrentine* that Plaintiff cites are no more pertinent to his argument than *Barrentine* was. In *Tran v. Tran*, 54 F.3d 115, 118 (2d Cir. 1995), the Second Circuit simply followed *Barrentine,* holding that a plaintiff was not required to exhaust the arbitral remedy under his collective bargaining agreement prior to filing an FLSA claim in district court. *Genesco, Inc. v. T. Kakiuchi & Co.*, 815 F.2d 840, 850 (2d Cir. 1987) does not involve FLSA claims; rather, the court addressed the question of whether a plaintiff's civil RICO claims were arbitrable.

### B. *Cheeks* Does Not Render Plaintiff's Claims Non-Arbitrable

Plaintiff also argues that the Second Circuit's recent decision in *Cheeks v. Freeport Pancake House, Inc.*, 796 F.3d 199 (2d Cir. 2015) stands for the proposition that FLSA claims cannot be waived or disposed of without the approval of a court or the U.S. Department of Labor and that they are therefore non-arbitrable. Pl. Opp. at 7.

*Cheeks* is not applicable in this context. In *Cheeks*, the Second Circuit held that stipulated dismissals settling FLSA claims with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii) required approval of the district court or the Department of Labor to take effect. *Cheeks,* 796 F.3d at 206. Here, Plaintiff and Defendant are not trying to settle a

11

claim asserted in a lawsuit; they propose to litigate a claim, and the only question is, in what type of forum. Nothing in *Cheeks* stands for the proposition that FLSA claims cannot be arbitrated; it does, however, mean that any settlement of such a claim must be court-approved.

### C. Plaintiff's Argument That Certain Provisions of the Agreement Render the Agreement to Arbitrate Unenforceable Fail

Plaintiff further contends that, under *Cheeks* and *Barrentine*, arbitration of his FLSA claims is prohibited because the IC Agreement contains terms that would result in a "waiver of Plaintiff's FLSA-protected wages." Specifically, Plaintiff argues that the "costs of arbitration" are higher than he would likely collect in wages, resulting in "not only a waiver but a de facto penalty" for arbitrating his claims, and that the inconvenience of arbitrating claims in California, combined with the risk of having to pay defense counsel's costs if he lost, create "an insurmountable obstacle" to arbitration. Pl. Opp. at 8. Plaintiff also claims that *Cheeks* holds that FLSA proceedings cannot be confidential, and JAMS' confidentiality rules are inconsistent with that instruction. *Id.* at 4-5, 7-8.

Plaintiff's contention that certain provisions of the Agreement render his claims non-arbitrable because they result in an impermissible "waiver" of his statutory rights under *Cheeks* and *Barrentine* is, in substance, an assertion that those provisions of the Agreement are unconscionable. But under New York law, a claim like the ones Plaintiff makes will not render an arbitration clause unenforceable if it can be severed without doing violence to the essence of the agreement.

The argument that certain provisions of the IC Agreement are problematic does, however, have some merit. In response to Plaintiff's objections to particular provisions, Defendant has either agreed to waive the offending provision or argued that the incorporation of JAMS' rules cures any potential obstacle.

### 1. Forum Selection

The IC Agreement states that "The arbitration shall be administered by JAMS at its office located at Two Embarcadero Center, Suite 1500, San Francisco, CA 94111." (Wessing Decl. Ex. A, ¶ 7.2). Defendant argues that the incorporation of JAMS rules cures any obstacle this clause might pose, because the rules specify that the arbitration hearing itself (as opposed to any "administration" of the arbitration) may take place at a location convenient to the parties. Rule 19 of the JAMS rules states that the arbitrator, "in order to hear a third-party witness, or for the convenience of the Parties or the witnesses, may conduct the Hearing at any location." *See* Declaration of Benjamin W. Berkowitz dated January 15, 2016 (hereafter "Berkowitz Decl."), Ex. A (JAMS' Employment Arbitration Rule 19). Rule 6 further states that "[i]n determining the location of the Hearing, such factors as the subject matter of the dispute, the convenience of the Parties and witnesses, and the relative resources of the Parties shall be considered, but in no event will the Hearing be scheduled in a location that precludes attendance by the Employee."

The distinction between the location of the "administration" of the arbitration and the location of the hearing itself is not apparent. There is no logical reason that JAMS would administer its arbitration out of its San Francisco office but hold a hearing in New York. I therefore find that there could be a conflict between the forum selection clause and JAMS' rules. The IC Agreement provides that, in the event of a conflict between JAMS' rules and the IC Agreement, the Agreement controls, Wessing Decl. at Ex. A (IC Agreement, ¶7.2), which would mean that per the IC Agreement, Plaintiff could be compelled to arbitrate his claims in California. Given Plaintiff's means and the relative amounts of money at issue, forcing him to arbitrate 3,000 miles away from his home would likely preclude him from pursuing his FLSA claim in arbitration. *See* February 5, 2016 Letter to the Court Attaching Affidavit of Plaintiff's Financial Status (filed under seal). However, in a letter to the Court, Instacart's counsel stated

that Instacart consents to proceed with arbitration in New York City, where Moton lives. Docket No. 31. Instacart has therefore waived the forum selection clause.

### 2. Fee-Splitting

The IC Agreement states that, "The parties will *equally* advance all of the arbitrator's expenses and fees," (Wessing Decl. Ex. A, ¶ 7.3) (emphasis added), whereas JAMS rules provide that, "The only fee that an employee may be required to pay is JAMS' initial Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's services." Wessing Decl., Ex. A (IC Agreement, Ex. B (Standard No. 6)). Here too is a conflict between the JAMS Rules and the Agreement. However, counsel for Instacart has advised the court that Instacart will pay the arbitrator's fees in any arbitration, as consistent with JAMS' Minimum Standards of Procedural Fairness. Berkowitz Decl. ¶ 2; Docket No. 31. Thus, Instacart has agreed to waive the fee-splitting provision of the IC Agreement.

### 3. Fee-Shifting

Regarding the fee-shifting of legal costs, Defendant argues that (1) the IC agreement only authorizes the arbitrator to award relief that is available to a litigant in a court of law and (2) the JAMS Minimum Standards of Procedural Fairness explicitly prohibit the imposition of costs that would serve to preclude an employee's access to arbitration. Wessing Decl. at Ex. A (IC Agreement, ¶7.3 & Ex. B (Standard No. 6)). Thus, the Court should not find that the fee-shifting provision compels Plaintiff to "waive" his statutory rights.

Here, there is no conflict between the IC Agreement and the JAMS rules. The incorporation of JAMS' rules into the Agreement forecloses any argument that the discretionary fee-shifting permitted by the Agreement could force Plaintiff to waive his statutory rights.

The IC Agreement states that, "In his discretion, the arbitrator may award legal fees and costs to the prevailing party." (Wessing Decl. Ex. A, ¶ 7.3). However, the fee-shifting in the IC Agreement is not *mandatory*, it is purely discretionary. And in a JAMS arbitration, that discretion must be exercised in accordance with JAMS' rules.

The JAMS Minimum Standards provide Plaintiff with sufficient protection again fee shifting. Standard 6 states:

> An employee's access to arbitration must not be precluded by the employee's inability to pay any costs or by the location of the arbitration. The only fee that an employee may be required to pay is JAMS' initial Case Management Fee. All other costs must be borne by the company, including any additional JAMS Case Management Fee and all professional fees for the arbitrator's service. In California, the arbitration provision may not require an employee who does not prevail to pay the fees and costs incurred by the opposing party.

Wessing Decl. Ex. B (Standard No. 6). JAMS' Minimum Standards explicitly require that a plaintiff's access to arbitration not be inhibited by his financial means. In the context of fee-shifting, that means an arbitrator *will not* award costs to Instacart if Instacart prevails, where the Plaintiff is of limited financial means.

Furthermore, the IC Agreement provides that the arbitration will be "administered" (whatever that means) in California, where – as JAMS' Rules note – fee-shifting to an employee who loses is not permitted by law. Taking the IC Agreement at face value, fee-shifting is prohibited. Because the JAMS Minimum Standards state that an employee will not be prevented from vindicating his rights due to any costs of arbitration – and that provision does not conflict with the IC Agreement – there is little concern that the fee-shifting provision would pose an insurmountable obstacle to Plaintiff's arbitration of his statutory claims.

#### 4. The Problematic Clauses Can Be Severed From the Agreement Per Defendant's Waiver

The Court is thus confronted with two clauses that could conceivably effect a waiver of Plaintiff's statutory rights under the FLSA: (1) the forum selection cause, and (2) the fee-splitting provision. Defendant has agreed to waive both provisions.

The Second Circuit has held that New York law permits the enforcement of an arbitration agreement as modified by a defendant's waivers. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 124 (2d Cir. 2010). *See also In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 412 (S.D.N.Y. 2003). Since Defendant has expressly waived the fee-splitting provision and forum selection clauses, those provisions are severed from the Agreement. The arbitration clause as a whole remains enforceable.

#### 5. Confidentiality of Arbitration Does Not Render FLSA Claims Non-Arbitrable

Finally, Plaintiff argues that under *Cheeks*, "arbitration of FLSA claims is prohibited ... because of the confidentiality of the arbitration proceedings under JAMS' Rules."

As noted above, *Cheeks* addressed the unrelated question of whether, "FLSA actions are an exception to Rule 41(a)(1)(A)(ii)'s general rule that parties may stipulate to the dismissal of an action without the involvement of the court" and held that such dismissals require approval of the district court or the Department of Labor. 796 F.3d at 201. *Cheeks* does not prohibit arbitration of FLSA claims. None of the other cases cited by Moton, all of which involve the question of whether the parties may keep *settlement* of their FLSA claims confidential, not whether FLSA arbitration proceedings must be conducted in a court, suggests otherwise.

Further, JAMS' Rules explicitly anticipate that, while the proceedings and award are otherwise confidential in nature, the parties may disclose information regarding the arbitration "as necessary in connection with a judicial challenge to or enforcement of an Award, or [if]

otherwise required by law or judicial decision." Berkowitz Decl. Ex. A (JAMS' Employment Arbitration Rules 26). This rule obviates Moton's concerns that confidentiality of the arbitration proceeding could somehow infringe his ability to vindicate his statutory rights. To the extent that Rule 26's confidentiality provisions can be interpreted as requiring that details of any Award be kept confidential in contravention of FLSA policy, that issue is not currently before the Court and can be decided if and when it arises.

## IV. Plaintiff's Claims Are Stayed

Defendant's motion to compel arbitration is granted. Further, although Defendant has requested that the Court dismiss this action upon granting its motion, the case will be stayed pending the outcome of arbitration. As the Second Circuit reasoned in *Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir.), a stay permits the parties "to proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation," should judicial participation in the arbitral process prove necessary. *Id.* at 346.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration is granted. The Clerk of the Court is directed to remove Docket No. 7 from the Court's list of pending motions.

Dated: February 9, 2016

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

17